## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **TERRY WAYNE HANKES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  08-CV-333-JHP-TLW** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

This matter was presented to the Court during a non-jury trial which began on September 28, 2009 and concluded on September 30, 2009.  The transcript of the proceedings was filed November 23, 2009.  Closing arguments were submitted by the parties on January 8, 2010.  After consideration of all evidence and relevant caselaw, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

**A.      Jurisdiction and Venue**

1.      Plaintiff brings this action pursuant to the Federal Tort Claims Act, 28 U.S.C., §2671 et seq., invoking federal question jurisdiction.

2.      The alleged acts or omissions giving rise to this action occurred within this Court's judicial district.

3.      At the time of the events which gave rise to this case, Plaintiff was a resident of Tulsa, Oklahoma, which is within this Court's judicial district.  (Pretrial Order, Dkt. # 55, at 3).

**B.      Medical Care and Events**

4.      This is an action for money damages brought by the plaintiff, Terry Wayne Hankes.  Mr. Hankes claims he received negligent medical care below acceptable medical standards on September 28, 2005, at the Claremore Indian Hospital ("CIH") in Claremore, Oklahoma.  CIH is owned and operated by Defendant through the U.S. Department of Health and Human Services. (Pretrial Order, Dkt. # 55, at 1, 12).

5.      Mr. Hankes was a patient at CIH from September 26, 2005, through September 28, 2005, and October 18, 2005, through October 27, 2005.  (Pretrial Order, Dkt. # 55, at 4).

6.      On September 26, 2005, Mr. Hankes presented to CIH at 0654 hours complaining of abdominal pain and uncontrolled type II diabetes (blood sugars at home were between 400 and 500).  (Def. Exhibit 1, part 1:R-128, R-147].[1] (Dr. Dzurilla testimony, Trial Tr. 97-99).  The normal range for blood sugars is 70-110 mg/dl.

7.      Doctor's Orders for Mr. Hankes' CIH stay of  September 26, 2005, through September 28, 2005, are found at Def. Exhibit 1, part 1:R-140-135; see Dr. Dzurilla testimony, Trial Tr. 132-133.

---

[1]  The Discharge Summary erroneously shows "Date of Admission" as 09/25/05.

8.     At 1200 hours on September 26, 2005, Orders were written by Dr. Dzurilla to admit Mr. Hankes to CIH Intensive Care Unit (ICU), which orders included, among others, the following:

•1800 cal ADA clear liquid diet;
•insulin gtts @ 4 units/hour;
•Demerol 50 mg IV every 6 hours;
•finger stick blood sugar every 2 hours.

(Def. Exhibit 1, part 1:R-135; Dr. Dzurilla testimony, Trial Tr. at 100-104, and 134).

9.     Pursuant to the above orders, Mr. Hankes was admitted to ICU and physically received by that unit at 1525 hours (Dr. Dzurilla testimony, Trial Tr. at 134 and ICU nurses' notes at Def. Exhibit 1, part 1:R-119-121).

10.    While in ICU, Mr. Hankes responded well to the insulin drip for his blood sugars (Dr. Jarolim testimony, Trial Tr. 272; Nurse Sennett testimony, Trial Tr. 195).

11.    ICU flow sheet for September 28, 2005, shows that Mr. Hankes was NPO for breakfast and percent eaten for lunch was 100%.  (Def. Exhibit 1, part 1:R-113-111; Nurse Sennett testimony, Trial Tr. 195-197; Dr. Jarolim testimony, Trial Tr. 273; Nurse Lisa Lee testimony, Trial Tr. 328).  Nurse Sennett testified that Mr. Hankes ate 100% of his lunch which was given "a little bit before eleven" (Trial Tr. 202), and that the lunch was based upon the 1600 calorie ADA diet prescribed by Dr. Dzurilla at  1020 on September 28, 2005 (Trial Tr. 203, 204).

12.    On September 28, 2005, at 1020 hours, Dr. Dzurilla also ordered Mr. Hankes to be  transferred to General Medicine and Surgery (GMS) ward as well as the following:

   •vital signs every four hours;
   •finger stick blood sugar AC & HS (before each meal and at bedtime)
   •heplock IV (HLN);
   •Demerol 50 mg IV every 4 hours, as needed.

and Dr. Dzurilla on September 28, 2005, at 1300 hours ordered:

   •Regular insulin 15 units subcutaneous AC;
   •NPH insulin 20 units subcutaneous twice a day; and
   •Regular insulin subcutaneous on a sliding scale of: 130 - 180 blood glucose
     level = 5 units,  greater than 180 blood glucose level = 10 units.

 (Def. Exhibit 1, part 1:R-139).

   13. Mr. Hankes was transferred from ICU to, and received by,  GMS on this date

at approximately 1350 to 1400 hours.   (Def. Exhibit 1, part 1:R-134; Nurse Meisenheimer

testimony, Trial Tr. 207; Nurse Lisa Lee testimony, Trial Tr. 324-325).    Rae Ann

Meisenheimer, R.N., the nurse who cared for Plaintiff on GMS, took and recorded Mr.

Hankes' vitals, oriented him to his room, and advised him of the plan of care, including

safety.  He was advised to stay in his room and, if he needed to get up out of bed, to call the

nurse.  Mr. Hankes verbalized his understanding.  Mr. Hankes was not accompanied at this

time by any family members or friends.  (Def. Exhibit 1, part 1:R-134; Nurse Meisenheimer

testimony, Trial Tr. 209, 212; Nurse Lisa Lee testimony, Trial Tr. 324-325).  Mr. Hankes

does not have any recollection of any of his stay at CIH during September 26 through 28,

2005.  (Hankes testimony, Trial Tr. 25).  Patient Education Record also shows that Nurse

Meisenheimer educated Mr. Hankes as to OR (orientation of the room), POC (plan of care),

RI (patient rights and responsibilities), and S (safety); that Mr. Hankes showed no barriers

to learning, was receptive to learning, showed good level of understanding; and that the

education goal was met.  (Def. Exhibit 1, part 1: R-109; Nurse Meisenheimer testimony, Trial Tr. 209-211; Nurse Lisa Lee testimony, Trial Tr. 325-326).  Mr. Hankes had been advised that he had a responsibility to abide by the doctor's orders and nursing instructions. (Nurse Meisenheimer testimony, Trial Tr. 210).  Plaintiff's nursing expert admitted that she had not seen the patient education record (Def. Exhibit 1, part 1: R-109) in the chart.  (Moss testimony, Trial Tr. 173).

14.    At approximately 1630 hours, Plaintiff's blood glucose level was 214 as indicated by  finger stick.  Per physician's orders, 25 units of Regular insulin and 20 units of NPH insulin were administered.  (Def. Exhibit 1, part 1: R-91; Nurse Meisenheimer testimony, Trial Tr. 213-214; Nurse Lisa Lee testimony, Trial Tr. 326-327).  This insulin was administered after Mr. Hankes received his evening meal, which meal was given in accordance with the 1600 calorie ADA diet ordered by the doctor that morning.  (Nurse Meisenheimer testimony, Trial Tr. 215; Def. Exhibit 1, Part 1, R-139).  This administration of insulin was in compliance with doctor's orders and in compliance with nursing standards of care. (Dr. Fusco testimony, Trial Depo. Tr. 42; Nurse Lisa Lee testimony, Trial Tr. 328-329; Dr. Jarolim testimony, Trial Tr. 274).  The sliding scale dosage was appropriately given in conjunction with the regular and fast-acting insulin, according to doctor's orders. (Dr. Jarolim testimony, Trial Tr. 274).  The percent intake of this meal was not documented, as the patient's chart was taken to the ER at 1845 and was not available to the night aide who transferred food intake information from the GMS room number/intake sheet to the charts for patients on GMS.  (Nurse Meisenheimer testimony, Trial Tr. 239-240).

15.     Mr. Hankes' medical expert, Dr. Fusco, was of the opinion that the nurses on September 28, 2005, failed to observe and monitor Mr. Hankes' condition. (Trial Depo. Tr. 41). However, when asked what he would consider timely observation and assessment of this patient who had been given insulin at 1630 and Demerol at 1700, Dr. Fusco responded: "I would say 20 minutes, 30 minutes after the dose is given – probably an hour after the doses were given." (Trial Depo. Tr. at 58. Medical records and testimony show that, after Mr. Hankes' insulin administration at 1630, he was observed at 1700 when he was given the Demerol and Ranitidene, and again approximately an hour later, documented at 1815. (Def. Exhibit 1, part 1: R-134, R-95, R-84; Nurse Meisenheimer testimony, Trial Tr. 215-222; Nurse Lisa Lee testimony, Trial Tr. 329-331; Dr. Jarolim testimony, Trial Tr. 275).

16.     At 1700 hours, Mr. Hankes was complaining of upper right abdominal pain of level 7 out of 10, was showing no abnormal physical signs, was grimacing, and requested Demerol. (Def. Exhibit 1, part 1: R-95, R-84; Nurse Meisenheimer testimony, Trial Tr. 215-218). Nurse Meisenheimer then flushed Plaintiff's heplock IV (HLN), administered the appropriate dosage of Demerol through Plaintiff's HLN, flushed the HLN, and administered 50 Mg Ranitidine through piggyback to his HLN, to be infused over thirty minutes. (Nurse Meisenheimer testimony, Trial Tr. 220-221).

17.     Nurse Meisenheimer checked Mr. Hankes' response to the 50 mg Demerol given approximately one hour earlier and documented these responses at 1815 hours. She observed the intensity of Mr. Hankes' pain at that time to be 3 or 4 out of 10, that Mr. Hankes was alert, side effects were none, and she attempted relaxation/distraction as

6

nonpharmocologic pain management. (Nurse Meisenheimer testimony, Trial Tr. 216, 218-219; Nurse Lisa Lee testimony, Trial Tr. 327-329; Def. Exhibit 1, part 1: R-95, R-84).

18.     Although there are conflicting times reflected in the medical records (nurse checked Mr. Hankes' response to medication and documented such at 1815 (R-84) ; and estimated time "after the fact" of 1815, notating call reporting patient's fall (R-129)), the Court finds that Mr. Hankes, very soon after observation by Nurse Meisenheimer, left the room with his friend Sandra Gibbs against nursing instruction (Def. Exhibit 1, part 1:R-134; Plaintiff's Exhibit 2; Def. Exhibit 2, Hillcrest Medical Center 11: "unauthorized breath of fresh air" as reported by wife) and walked out the front doors of the hospital, the trip taking approximately a minute (Nurse Meisenheimer testimony, Trial Tr. 208; Sandra Gibbs testimony, Trial Tr. 63).  Sandra Gibbs testified that this was around six o'clock "or pretty much after, a little bit after."  (Trial Tr. 66).  The trial testimony of Sandra Gibbs (Trial Tr. 62-63) contradicts that of Nurse Meisenheimer with regard to whether the attending nurse was told that Mr. Hankes intended to go outside and contradicts history she gave at Hillcrest Medical Center.  (Def. Exhibit 2, at 11).  Nurse Meisenheimer testified that no one told her of an intent by Mr. Hankes to go outside.   (Nurse Meisenheimer testimony, Trial Tr. 222-223).   The Court finds that Plaintiff has failed to carry his burden of proof and the greater weight of the evidence indicates Mr. Hankes' nurse was told that Mr. Hankes intended to go outside.

The Court further finds that Defendant did not authorize Mr. Hankes to go outside, and Mr. Hankes' being outside was not a breach in the standard of care for the hospital, or nurses, or supervising physician.  (Dr. Jarolim testimony, Trial Tr. 300).

19.     Sandra Gibbs testified that she left Mr. Hankes standing near a bench and went to her car to put away some dirty clothes.  Upon returning to Mr. Hankes, Ms. Gibbs saw that he had fallen and hit his head.  Both medical experts believe that Mr. Hankes had a seizure and then fell, hitting his head on the sidewalk. (Dr. Fusco testimony, Trial Depo. Tr. 37; Dr. Jarolim testimony, Trial Tr. 276: "I believe the cause of the fall was a seizure, although it could have been a sinkable [sic] (syncopal) episode, which is a blackout.")

20.     Mr. Hankes was lifted to an ER cart and taken to the emergency room (ER). Mr. Hankes was found to be severely diaphoretic, confused and combative, with incontinence of urine and bleeding from his ear and mouth.  (Dr. Jarolim testimony, Trial Tr. 293; Def. Exhibit 1, part 1: R-129-130, 134).

21.     Emergency Visit Record shows Mr. Hankes arrived at the ER at 1825 hours and he was triaged at 1825 hours and assessed by a physician.  (Def. Exhibit 1, part 1: R-129-130).  Although this same medical record shows that the patient was hooked up to a monitor at 1824, the time discrepancy was explained by testimony of the ER nurse that "[w]e do the care first and then attempt to do the charting and we try to judge the times as best we can or what we can remember" and that the timepieces may not be synchronized.  (Nurse Sandy Lee testimony, Trial Tr. 248).  Nurse Sandy Lee further testified that the notation of the phone call from the operator about Mr. Hankes' fall outside, found at Def. Exhibit 1, part 1: R-129,

8

was documented after the fact, by estimating the time "[a]fter we did the care, after the – after we finally got him on the monitor and the I.V.s and all going."  (Trial Tr. 249).

22.     Mr. Hankes' fingerstick blood glucose was measured upon his entering the ER at approximately 1825.  Documentation shows it was 74 mg/dl. (Def. Exhibit 1, part 1: R-130; Nurse Sandy Lee testimony, Trial Tr. 256).  Normal blood glucose levels range between 70 and 110 mg/dl.  (Def. Exhibit 1, part 1: R-130; Nurse Sandy Lee testimony, Trial Tr. 257).  Mr. Hankes' blood glucose level at 1849 was 80 mg/dl.  (Def. Exhibit 1, part 1: R-130).

23.     Prompt treatment and appropriate care continued from the ER as stated by Mr. Hankes' internal medicine expert, Dr. Fusco, and demonstrated by medical records.  (Trial Depo. Tr. 58).

24.     Mr. Hankes rapidly gained consciousness and underwent CT brain scanning which revealed a skull fracture, subarachnoid hemorrhage, intracranial hemorrhage and an epidural hematoma.  He was timely transferred to Hillcrest Medical Center to the care of a neurosurgeon.  (Dr. Fusco Report, Trial Depo. Tr. Exhibit 2, 2nd page).

25.     At times during Mr. Hankes' stay at Hillcrest Medical Center, he had blood glucose levels of 58 and 54 and was asymptomatic at those levels.  The lowest blood glucose levels documented at CIH on September 28 were in the 70s and 80s.  (Dr. Jarolim testimony, Trial Tr. 287).

26.     Mr. Hankes tolerated the Demerol dosage at 1700 hours  well. (Def. Exhibit 1, part 1: R-95; Dr. Jarolim testimony, Trial Tr. 275).  Although Dr. Fusco in his report stated that, after his medications, Mr. Hankes was predictably severely impaired and could not be

9

expected to make any appropriate decisions, his trial deposition testimony was; ". . . I don't know what his mental state was when he left.  I can guess." (Trial Depo. Tr. 47).

27.    Mr. Hankes appeared well when evaluated by Nurse Meisenheimer an hour after last medication, documented at 1815. (Def. Exhibit 1, part 1: R-134, R-95, R-84; Nurse Meisenheimer testimony, Trial Tr. 215-222; Nurse Lisa Lee testimony, Trial Tr. 329-331; Dr. Jarolim testimony, Trial Tr. 275).

28.    Although Mr. Hankes' expert claims that Mr. Hankes' fall was due to a hypoglycemic episode, the medical records and medical testimony do not support a finding that Mr. Hankes was hypoglycemic at any time, including at the time of his fall.  Mr. Hankes' medical expert, Dr. Fusco, testified that he was speculating that Mr. Hankes' blood sugar level at the time of his fall was lower than the normal range measurement of 74 on entry to the E.R. immediately after the seizure.  (Trial Depo. Tr. 60).

29.    Dr. Jarolim testified that in her opinion there were a number of possible causes for Mr. Hankes' fall on September 28, 2005 (Dr. Jarolim testimony, Trial Tr. 276-282), but that his fall was not caused by hypoglycemic seizure because by definition he did not have hypoglycemia. (Dr. Jarolim testimony, Trial Tr. 286-287).  Dr. Jarolim testified that Mr. Hankes' blood sugars immediately after his fall at CIH were in the 70s and 80s, within the target range of 70 to 110, and that hypoglycemic seizures occur with blood sugars in the single digits up to about mid-twenties.  (Trial Tr. 286).  Mr. Hankes exhibited blood sugars of 54 and 58 at Hillcrest Medical Center thereafter and he was asymptomatic with those levels.  (Dr. Jarolim testimony, Trial Tr. 287).

10

30.     The symptoms exhibited by Mr. Hankes when examined after his September 28, 2005, fall are similar to those found by EMSA personnel called to Mr. Hankes' residence on June 29, 2005, at approximately 2:24 a.m.   Mr. Hankes was severely diaphoretic, incontinent, combative, and "rolling around on floor."  "IV has to be held in place secondary to diaphoresis and flailing about." (Def. Exhibit 9, pp. 1-3; Dr. Jarolim testimony, Trial Tr. 282-283).

31.     Although there is testimony from Sandra Gibbs that Mr. Hankes was sweating profusely before leaving his room (Trial Tr. 63), the Pain Flow Chart (Def. Exhibit 1, part 1: R-95) indicates otherwise.  The Pain Flow Chart shows that Nurse Meisenheimer observed Mr. Hankes at 1700 on September 28, 2005; that Mr. Hankes was complaining of abdominal pain of intensity of 7/10, showing no physical signs of diaphoresis (sweating), and was grimacing; and that, on observing Mr. Hankes an hour later, his pain had decreased to 3-4/10, he was alert, and *showed no side effects*. (Nurse Meisenheimer testimony, Trial Tr. 215-219).

32.     Inconsistencies in Ms. Gibbs' testimony and inconsistencies between her testimony and the medical records persuade the Court that her testimony is not reliable, or that her recollection is at times faulty.

33.     The parties have stipulated that all doctors' orders pertaining to Mr. Hankes during his admission at CIH were appropriate and that the administration of Demerol to Mr. Hankes on September 28, 2005, at approximately 1700 hours was appropriate. (Pretrial Order, Dkt. # 55, at  4). The sole allegation by Mr. Hankes' experts of negligence on the part

of CIH was an allegation that the nursing staff on duty at the time of Mr. Hankes' fall on September 28, 2005, did not meet the standard of care.

33.     The Court finds that Mr. Hankes was given appropriate medication and properly monitored and cared for by his health care providers at CIH on September 28, 2005, and that the actions of the nurses attending Mr. Hankes on September 28, 2005, met the appropriate standard of care. The Court further finds that Mr. Hankes has failed to prove any breach in the standard of care provided to him by CIH during his September 26-28, 2005, admission to CIH.

34.     Plaintiff has failed to show by the greater weight of the evidence that negligence on the part of Defendant caused his fall on September 28, 2005, and his ensuing injuries and damages.  There is medical record evidence and testimony that Mr. Hankes had suffered blackouts five months prior to his fall at CIH.  Mr. Hankes sought medical care at Tulsa Regional Medical Center on April 20, 2005.  Mr. Hankes' admission History and Physical (Def. Exhibit 10, p. 6) shows: "The patient denies loss of consciousness that he is aware of, but wife states she believes he blacked out several times yesterday.  The patient complains of dizziness when he is sitting or standing up.   He denies any significant injuries to the head.  He complains of significant headaches on occiput of his head. . . . The patient states he has poor vision but has not had any recent change. He complains of diplopia [double vision] and states he has had several incidents of complete loss of vision."  Mr. Hankes did not advise his healthcare providers at CIH that he had suffered previous blackouts nor does

the medical record from CIH show that Mr. Hankes provided CIH staff with records from these outside healthcare facilities.

Dr. Fusco speculated that Mr. Hankes' fall might have been due to a hypoglycemic seizure. The medical records do not support a conclusion that Mr. Hankes experienced hypoglycemia. It was Dr. Jarolim's opinion that there were a number of likely medical causes for Mr. Hankes' fall indicated by the medical records. The Court is unable to determine, from the greater weight of the evidence or to a reasonable degree of medical certainty, which of the possible causes discussed at trial actually caused Mr. Hankes' fall.

## CONCLUSIONS OF LAW

**A.     Jurisdiction and Venue**

1.     Plaintiff brings this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680, alleging medical negligence on September 28, 2005.

2.     Jurisdiction is conferred upon this Court by virtue of 28 U.S.C. § 1346(b)(1), which grants jurisdiction to this Court over actions brought pursuant to the FTCA.

3.     The relevant Federal agency, the Department of Health and Human Services, on February 7, 2008, denied Plaintiff's administrative tort claim on the merits. On June 4, 2008, Plaintiff timely filed this lawsuit.

4.     Venue properly lies within this Court's judicial district pursuant to 28 U.S.C. § 1402(b). Plaintiff in this action resides within this Court's judicial district. The alleged actions or omissions giving rise to this action occurred within this Court's judicial district.

**B.     Medical Negligence**

5.    The Federal Torts Claims Act applies the law of the place where the alleged negligence occurred and makes the United States liable to the same extent as a private person under the same circumstances. _Wark v. United States_, 269 F.3d 1185, 1187 (10th Cir. 2001). Because the acts of alleged negligence at issue in this case took place in Oklahoma, the Court applies Oklahoma substantive law.

6.    In Oklahoma, a plaintiff claiming medical negligence must prove three elements: "(1) a duty owed by the defendant to protect the plaintiff from injury; (2) a failure properly to exercise or perform that duty; and (3) an injury to plaintiff proximately caused by the defendant's breach of that duty." _Roberson v. Jeffrey M. Waltner, M.D., Inc._, 108 P.3d 567, 569 (Okla.Civ.App. 2005).

7.    Health care providers employed by the United States have a duty to render medical care to the patient consistent with the national standard of care. _See_ 76 Okla. Stat. § 20.1.

## C.    Causation

8.    Plaintiff bears the burden of producing evidence tending to establish a causal link between the alleged negligence and the injury, and Plaintiff also bears the burden of persuading the trier of fact by the greater weight of the evidence that his injury was in fact caused by the alleged negligence. _McKellips v. Saint Francis Hosp. Inc._, 741 P.2d 467, 471 (Okla. 1987). The greater weight of the evidence simply means more probably true than not true or more likely so than not so. "Absolute certainty is not required, however, mere

possibility or speculation is insufficient." *Id.* at 471.  Where the probabilities are evenly balanced or less, the plaintiff has failed to carry his burden.  *Id.*

9.      Proximate cause consists of cause in fact and legal causation.  The latter concerns a determination as to whether legal liability should be imposed as a matter of law where cause in fact is established.  Cause in fact deals with the "but for" consequences of an act. *McKellips* at 470.

10.      In a medical malpractice action, if the origin of the injury is subjective or obscure and not readily apparent to a layman, or if there are several equally probable causes of the condition, testimony of a qualified physician is essential to establish a reasonable probability of the cause of the injury.   *Roberson*, 108 P.3d at 569.

11.      As more fully set forth in the Findings of Fact, the Court concludes that Mr. Hankes failed to carry his burden of establishing that his fall on September 28, 2005, and resulting injuries and damages, were caused by any negligence of CIH or breach in standard of care by Defendant.   From the evidence presented, the Court finds that Plaintiff experienced a seizure, or some type of syncopal episode, and then fell.   From the evidence presented, the Court is left to speculate and is unable to determine, to a reasonable degree of medical certainty, which of the possible reasons discussed at trial for his seizure or syncopatic episode actually caused Mr. Hankes' fall and resulting injuries.

### CONCLUSION

From the evidence submitted to the Court through testimony, exhibits, and pleadings, the Court finds that Plaintiff failed to establish that Defendant was negligent in rendering

medical or nursing care to Plaintiff or that any care of Plaintiff by Defendant resulted in his injuries. Therefore, the Court finds in favor of Defendant and against Plaintiff.

**IT IS SO ORDERED this 27th day of May, 2010.**

James H. Payne
United States District Judge
Northern District of Oklahoma

16